**Opinion issued June 25, 2013.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

**NO. 01-13-00023-CV**

**NO. 01-13-00024-CV**

———————————

**IN THE INTEREST OF B.R., A CHILD**

**IN THE INTEREST OF I.R., A CHILD**

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case Nos. 2010-05141J and 2011-00845J**

---

**MEMORANDUM OPINION**

These parental termination appeals involve two young children: I.R., whom the Texas Department of Family and Protective Services (Department) removed from his parent's care when he was approximately seven months old, and B.R., whom the Department took into custody at birth. After a bench trial, the trial court

terminated the rights of the mother and the father to both children. The parents, who no longer live together, appeal. Each contends that the evidence is legally and factually insufficient to support the findings that they each engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. *See* TEX. FAM. CODE ANN. § 161.001(1)(E) (West Supp. 2012). They also contend that the evidence is legally and factually insufficient to support the finding that either parent knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the children's physical or emotional well-being. *See id.* § 161.001(1)(D). Finally, they contend that the evidence does not support the trial court's findings that termination of their parental rights is in the children's best interests. We hold that legally and factually sufficient evidence supports the trial court's findings; we therefore affirm the terminations.

## Background

### I.R.'s birth.

I.R. was born in early March 2010. The mother had complications during pregnancy that caused her to give birth to I.R. at twenty-nine weeks. I.R. weighed two pounds at birth. He was born with underdeveloped lungs, a condition associated with prematurity. As a result of his breathing problems, I.R. spent much of his first ten weeks of life in the neonatal intensive care unit at Ben Taub

2

Hospital in Houston. In mid-May, the hospital released I.R. to his parents in stable condition; he did not require any medication.

**I.R.'s parents' relationship**.

I.R.'s parents lived together but were not married. Before I.R.'s birth, the mother had worked as a cashier, but she did not return to her job. When the hospital released I.R. to go home, the mother was I.R.'s primary caregiver. The father worked for a construction company, where he did odd jobs whenever they needed him, but but he did not have a long-term assignment. The father testified inconsistently about the amount of time he worked outside of the home: he initially told the authorities that he worked long hours and thus did not spend much time with I.R., but later recounted that he had cared for I.R. about forty percent of the time. The mother and father were I.R.'s only caregivers.

The father and mother disagreed about whether the father drank alcohol, as well as to what extent. The father testified that he did not currently drink alcohol. He admitted to drinking alcohol in the past, but he stated that he did not recall when he had last had a drink. The mother, however, testified that while they lived together, she was concerned about the extent of the father's drinking; it made her angry when he would leave her alone with the baby to go out drinking with his friends. He would come home drunk. The father denied arguing with the mother about his drinking.

3

The mother also testified that, after she gave birth to I.R., but before she brought him home from the hospital, the mother and the father had an argument. During this argument, the father grabbed the mother and pushed her. She described the father's behavior as inappropriate, but added that she was not afraid of him. The father did not recall pushing the mother.

**I.R.'s life with his parents.**

I.R. remained in his parents' care from May 17 until the mother took I.R. for a shoulder x-ray on July 22. While in his parents' care, I.R. sustained multiple serious injuries. Bilateral subdural hemorrhages appeared in the top portion of his cranium; both of his femurs fractured near the growth plate at the knees; the scapula in his left shoulder also was fractured; and he experienced trauma causing extensive bruising across his shoulders and back and on his legs.

The Department's expert witness, a Texas Children's Hospital pediatrician with seven years' experience and expertise in diagnosing child abuse, estimated that the earliest of I.R.'s injuries—the bleeding on his brain and the broken femurs—occurred within the first six weeks that I.R. was in his parents' care. The subdural hemorrhages may have resulted from multiple incidents, because, the expert noted, fresh blood was visible in I.R.'s x-rays. She testified that the type of femur fractures and the subdural hemorrhages presented in I.R. are consistent with

4

a caretaker's non-accidental whiplash motion, commonly referred to as "shaken baby."

The expert testified that babies with these types of femur fractures usually react with obvious pain and fussiness. The bleeding in the head, she explained, can cause a baby to go into a different state of consciousness; he would become quieter and sleepier, and possibly lose consciousness. A baby also might have had vomiting, fussiness, or poor feeding as a result of subdural hemorrhaging. Subdural hemorrhaging is extremely dangerous; it can cause developmental delay or death, because blood can pool at the base of the cranium, where it can pressure the brain stem and cause the baby to stop breathing.

I.R. also suffered a later-dated broken scapula in his right shoulder. Baby's bones are not easily broken: a baby's scapula can break from a fast and forceful blow to the back, from jerking the baby's arm in the direction opposite the deltoid muscle, or as a result of the same whiplash motion that causes shaken baby syndrome. A typical baby would react to that type of shoulder injury by becoming very irritable and by holding his arm still.

The mother testified that, in early July, I.R. started crying whenever she picked him up, and his left shoulder appeared to hurt him. She explained that she not immediately seek medical attention, because after a few days, the baby seemed to be "over it." But, in mid-July, I.R. started crying again, so the mother took him

5

to see his pediatrician. The mother later testified that, at our around the time the baby first showed difficulty using his right arm, she had left I.R. alone with his father—the only time she did so—to attend a doctor's appointment.

The pediatrician examined I.R. and prescribed an X-ray to be done at Ben Taub Hospital. According to the mother, the pediatrician told her that the mother could decide on her own whether or not to take I.R. for an x-ray. The mother, who by then was two months' pregnant with B.R., had an obstetric appointment at Ben Taub about a week later. She waited and brought I.R. for his x-ray that day.

**The Department takes I.R. into custody.**

When the mother brought I.R. for the x-ray, the extensive bruising on his body was still fairly fresh. The Ben Taub doctors examined the x-rays and discovered I.R.'s multiple serious injuries. They observed that the subdural hemorrhaging had filled I.R.'s fontanelle with blood. Because that condition might have developed into a situation that would require emergency surgery, the doctors transferred I.R. to Texas Children's Hospital, where a neurosurgery team would be available. An ambulance transported I.R. to Texas Children's, and he was admitted to the intensive care unit.

The hospital staff and the Department questioned the mother and father about the circumstances that led to I.R.'s hospitalization. The parents did not point to any history of trauma to explain subdural hemorrhaging or fractures. The father

6

testified that he had no idea that I.R. had those injuries until I.R. was taken to the hospital. Both parents mentioned that I.R. bruised easily. Both denied that they knew the causes of I.R.'s injuries, and neither implicated the other.

After the mother was told that the hospital had referred I.R.'s case to the Department because of his unexplained injuries, the mother and father brainstormed about how I.R.'s injuries could have occurred. In a later interview, the mother speculated that I.R. could have hit his head on the crib. She also recalled that I.R.'s six- and four-year-old cousins had visited and may have hurt I.R., although she conceded that the children had never been left alone with I.R.

The expert witness ruled out the possibility that these kinds of incidents could have caused the types of injuries that I.R. had. She also eliminated the possibility that any underlying medical condition could have caused I.R.'s injuries. The Department took I.R. into custody and determined that, due to the severity of I.R.'s injuries and the length of time over which the injuries occurred, the goal for him would be termination of parental rights and adoption.

### The parents' subsequent conduct.

During the criminal investigation into the circumstances that led to I.R.'s injuries, the mother admitted to an investigating officer that she had used force at one point to pull on I.R.'s leg. A Harris County grand jury indicted the mother on a charge of serious bodily injury of a child. The mother remained in Harris County

jail from the fall of 2010 until the spring of 2012, when the district attorney dismissed the charge. While the mother was in jail, she gave birth to B.R., a girl. Four days after her birth, the Department placed B.R. in the foster home where her brother lived. During the mother's incarceration, the father became involved with another woman. By the time of trial, they were living together and engaged to be married.

Both parents completed the court-ordered family service plan requirements. The children's foster mother intervened in the proceeding. She testified that, since I.R.'s placement with her, she has taken him to over fifty medical appointments, including doctor visits, therapeutic treatment, and early childhood intervention. In her home, I.R. has made substantial progress in overcoming his physical developmental delays, but continues to have some cognitive developmental delay. Lung problems, such as pneumonia and asthma, persist: he regularly sees a pulmonologist and had five bouts of pneumonia during the winter. B.R. has no developmental concerns and has met all of her pediatric milestones.

## Discussion

### I.    Standard of Review.

A parent's rights to the "companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982);

*see In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003). A termination decree is complete, final, irrevocable, and divests for all time that natural right as well as all legal rights, privileges, duties, and powers with respect to each other except for the child's right to inherit. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Id.* However, "the rights of natural parents are not absolute" and "the rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). Recognizing that a parent may forfeit his or her parental rights by their acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *Id.*

In a case to terminate parental rights under section 161.001, the Department must prove, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions, justifying termination and (2) that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001; *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009). Clear and convincing evidence is "proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." *In re J.O.A.*, 283 S.W.3d at 344. "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is

9

in the child's best interest." *In re A.V.*, 113 S.W.3d at 362. Thus, if the trial court's judgment relies on multiple predicate grounds, we may affirm on any one of those grounds. *In re D.S.*, 333 S.W.3d 379, 388 (Tex. App.—Amarillo 2011, no pet.); *In re S.N.*, 272 S.W.3d 45, 49 (Tex. App.—Waco 2008, no pet.).

In reviewing the legal sufficiency of the evidence in a parental-rights-termination case under section 161.001, we look at all the evidence to determine whether the evidence, viewed in the light most favorable to the finding, is such that the factfinder could reasonably have formed a firm belief or conviction about the truth of the issues on which the Department bore the burden of proof. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (per curiam); *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). We defer to the trial court as fact-finder, and resolve disputed facts in favor of its finding if a reasonable factfinder could do so. *In re J.P.B.*, 180 S.W.3d at 573; *In re J.F.C.*, 96 S.W.3d at 266; *Jordan v. Dossey*, 325 S.W.3d 700, 712–13 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Termination findings withstand a factual sufficiency challenge if the evidence is such that a reasonable jury could form a firm belief or conviction that the statutory grounds for termination exist. *In re C.H.*, 89 S.W.3d 17, 18–19 (Tex. 2002). To reverse a case on factual insufficiency grounds, "the reviewing court must detail the evidence relevant to the issue of parental termination and clearly

state why the evidence is insufficient to support a termination finding by clear and convincing evidence." *Id.* at 19.

## II. Evidentiary sufficiency.

In their separate appeals, the mother and the father each contend that the evidence is legally and factually insufficient to support termination of their parental rights under Texas Family Code sections 161.001(1)(D) and (E). Section 161.001(1)(D) provides that a "court may order termination of the parent-child relationship if the court finds by clear and convincing evidence . . . that the parent has . . . knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(D). Subsection 161.001(1)(E) provides that a parent's rights can be terminated when she has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E). "'To endanger' means to expose a child to loss or injury or to jeopardize a child's emotional or physical health." *Jordan*, 325 S.W.3d at, 723; *see also In re T.N.*, 180 S.W.3d 376, 383 (Tex. App.—Amarillo 2005, no pet.) (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). A child is endangered when the environment creates a potential for danger that the parent disregards. *Jordan*, 325

S.W.3d at 721; *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.).

"Although 'endanger' means more than a threat of injury or the possible ill effects of a less-than-ideal environment, it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *In re T.N.*, 180 S.W.3d at 383 (citing *In re M.C.*, 917 S.W.2d at 269); *see also In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) (holding that endangering conduct is not limited to actions directed toward child); *Jordan*, 325 S.W.3d at 723 (holding that danger to child need not be established as independent proposition and may be inferred from parental misconduct even if conduct is not directed at child and child suffers no actual injury); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616–17 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (explaining that relevant conduct may occur either before or after child's removal from home).

Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under section 161.001(1)(D). *Jordan*, 325 S.W.3d at 721; *In re M.R.J.M.*, 280 S.W.3d at 502. Thus, although the focus of subsection (D) is on the child's living environment and not on the parent's conduct, parental conduct may produce an endangering environment. *See Jordan*, 325 S.W.3d at 721. Placement with an

12

abusive parent or relative is endangerment under either provision of the statute. *See In re J.M.C.A.*, 31 S.W.3d 692, 698 (Tex. App.—Houston [1st Dist.] 2000, no pet.) (terminating parental rights of mother who allowed children to remain with abusive father).

Under subsection (E), the relevant inquiry is whether evidence exists that the parent's conduct—including acts, omissions, and failures to act, both before and after the birth of the child—directly endangered the child's physical well-being. *In re J.W.*, 152 S.W.3d 200, 205 (Tex. App.—Dallas 2004, pet. denied); *see Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533–34 (Tex. 1997); *In re D.M.*, 58 S.W.3d 801, 812 (Tex. App.—Fort Worth 2001, no pet.). Parental conduct may be relevant even if it does not involve the child or result in actual harm to the child. *In re D.M.*, 58 S.W.3d at 811; *see also Jordan*, 325 S.W.3d at 723 ("The relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being."); *Cervantes-Peterson v. Tex. Dep't of Family and Protective Servs.*, 221 S.W.3d 244, 253 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (explaining that "the manner in which a parent treats other children in the family can be considered in deciding whether that parent engaged in a course of conduct that endangered the physical or emotional well-being of a child"). Termination under subsection (E) must be based on more than a single act or omission: the evidence must demonstrate a voluntary, deliberate, and conscious

course of conduct by the parent. *Jordan*, 325 S.W.3d at 723; *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet).

### A. I.R.'s endangerment.

The parents contend that no record evidence shows that either parent was the one who injured I.R., and they also point to the testimony of the Department caseworker, who stated that she did not know who caused his injuries. Thus, the parents contend, the evidence is legally insufficient both under subsection (D), which requires a showing that the environment or conditions in which the child is placed endangered the child's physical or emotional well-being, and under subsection (E), which requires a parent's conduct to cause the endangerment, as evidenced by the parent's actions but also by the parent's omissions or failure to act.

It is true that no direct evidence identifies one parent as the perpetrator of the injuries to I.R. Strong circumstantial evidence, however, supports the trial court's findings on these issues. Both parents cared for I.R., and they were I.R.'s sole caregivers. I.R. suffered multiple serious injuries—fractures to both legs, one shoulder and skull fractures—inflicted on different occasions while in the parents' care. The medical expert opined that I.R.'s injuries were non-accidental and that I.R. would have exhibited symptoms of considerable discomfort and pain, as well as other symptoms, from these injuries. A reasonable caregiver, she observed,

14

would not have ignored I.R.'s symptoms and complaints but instead would have sought prompt medical treatment.

The parents both denied harming I.R., denied any knowledge of the other parent harming I.R., and denied any awareness of most of his injuries before he arrived at the hospital. But the medical expert testified that the parents' explanations for the possible causes of I.R.'s injuries and their proffered reasons for delay in seeking medical treatment were implausible. The trial court reasonably could have resolved this controverted evidence by not crediting the parents' explanations. We conclude that the trial court reasonably could have formed a firm belief or conviction that both the mother and the father knowingly placed I.R. or allowed him to remain in conditions that endangered his physical and emotional well-being. This single ground is enough to support the termination of the mother's and father's parental rights to I.R. *See D.S.*, 333 S.W.3d at 388; *S.N.*, 272 S.W.3d at 49; *see also In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (holding that evidence that parents were child's only caregivers and that injuries did not occur all at once and were the result of ongoing mistreatment was legally sufficient to support termination of parents' rights).

## B.   B.R.'s endangerment.

The mother argues that the evidence is insufficient to support the termination of her parental rights to B.R., because the endangerment finding pertains only to her conduct toward I.R. In *Boyd*, however, the Texas Supreme Court rejected the notion that "danger cannot be inferred from parental misconduct," and emphasized that, for termination under subsection (E), "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." 727 S.W.2d at 533; *accord Allred v. Harris Cnty. Child Welfare Unit*, 615 S.W.2d 803, 806 (Tex. Civ. App.—Houston [1st Dist.] 1980, writ ref'd n.r.e.). A factfinder may consider the parent's conduct toward the other parent or other children to find endangerment of a child who was not born at the time of the conduct. *See In re W.J.H.*, 111 S.W.3d 707, 716 (Tex. App.—Fort Worth 2003, pet. denied); *In re D.T.*, 34 S.W.3d 625, 637 (Tex. App.—Fort Worth 2000, pet. denied). The abuse that I.R. suffered while in his mother's care is sufficient to support termination of her parental rights to B.R. *See Boyd*, 727 S.W.2d at 533.

Pointing to the Fort Worth Court of Appeals' decision in *In re A.B.*, the father contends that the evidence does not support termination of his parental rights to B.R, because none of the evidence directly connected him to the harm of the children. No. 02-11-00029-CV, 2012 WL 4010404, at *19 (Tex. App.—Fort Worth Sept. 13, 2012, no pet.). *In re A.B.* involved whether the father's hostile

16

conduct toward police officers and Department employees supported a finding that his conduct endangered the well-being of his children. *Id.* at *19–20. In finding the evidence factually insufficient, the appellate court observed that the father never directed his hostility toward his children or the children's mother. *Id.* at *20.

In contrast, the record before us contains evidence that the father knowingly placed or allowed B.R.'s brother, I.R., to remain in conditions that endangered his physical and emotional well-being. That evidence is, in turn, is sufficient to support termination of the father's parental rights to B.R. *See In re Baby Boy R.*, 191 S.W.3d 916, 925 (Tex. App.—Dallas 2006, pet. denied) (affirming trial court's finding that defendant's abuse of his stepdaughter constituted conduct that endangered the physical or emotional well-being of his unborn son).

## C.    Best interests of I.R. and B.R.

A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). In *Holley v. Adams*, the Texas Supreme Court provided a nonexclusive list of factors that the trier of fact in a termination case may use in determining the best interests of the child. 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the

17

individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id.* These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to parental termination. *In re C.H.*, 89 S.W.3d at 27; *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.).

### 1. The children's desires.

At the time of trial, I.R. and B.R. were toddlers and could not directly express their desires. The evidence shows that the children were happy and thriving in their foster home, but also enjoyed their visits with their parents. This factor does not weigh either for or against a finding that termination is in the children's best interest.

### 2. The children's physical and emotional needs, and the emotional and physical danger to the children, now and in the future.

The foster mother, who is also an elementary school teacher, has been diligent in seeking medical care and therapeutic intervention to help I.R. overcome

his physical and cognitive delays. The record shows that I.R.'s lung condition requires regular, and sometimes urgent, medical care, and the Department expressed concern about the parents' ability to respond to these needs. B.R. plays well with her brother, and they appear to share a strong sibling bond. The evidence regarding endangerment is probative in determining the child's best interest. *See In re C.H.*, 89 S.W.3d at 28; *Walker*, 312 S.W.3d at 616–17. The parents' inability or failure to explain or take responsibility for I.R.'s injuries leaves open the possibility of future similar mistreatment if the children were left unsupervised in the care of either parent. This factor strongly supports the conclusion that termination is in the children's best interest.

### 3. The parental ability and programs available to assist in promoting the children's best interests.

The parents completed classes and the other terms of the family service plans. Neither, however, explained how they would meet I.R.'s health and educational needs, and neither supported a ruling that would have preserved the other's parental rights to the children. The foster parent has worked with numerous medical and other health care professionals to ensure that I.R. is receiving interventions that will optimize his abilities. This factor weighs in favor of a finding that termination is in the children's best interest.

19

**4. Stability of the home or proposed placement.**

The mother currently has no independent means of support, and is living with other family members. She would apply for public assistance to help support the children. The father would have the children live with him, his fiancée, and her two children. The foster parent wishes to adopt the children, a plan endorsed by the Department. The foster parent has been the primary caregiver for the children from a very young age and offers them stability. This factor also favors termination.

**5. The acts or omissions of the parents and any excuse for such acts or omissions.**

The parents continue to be unable to explain how I.R. became injured. His injuries were serious and numerous and occurred on more than one occasion, over the time he was in his parents' care. Neither parent showed any insight into how the circumstances that caused I.R.'s serious injuries arose. Both had troubling inconsistencies in their testimony concerning those circumstances. In short, neither parent offered a reason for the trial court to have any confidence that either parent would protect their children from the same kind of abuse, endangerment, and serious medical neglect that I.R. suffered while once in their care. This factor weighs in favor of termination.

## Conclusion

The evidence supporting the trial court's endangerment findings, as well as that relating to the *Holley* factors, supports a firm belief or conviction that the trial court reasonably could have concluded that termination of the parents' rights was in the children's best interest. We therefore affirm the judgment of the trial court.

Jane Bland
Justice

Panel consists of Justices Keyes, Higley, and Bland.